

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 20, 2026**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CASE NO. 24-33155-MVL11** |
| **DENALI CONSTRUCTION SERVICES, LLC.** | § | **(CHAPTER 11)** |
| | § | |
| | § | |
| **Debtor.** | § | |
| | § | |
| **DENALI CONSTRUCTION SERVICES, LLC.,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **CLOUDFUND, LLC; TRUE BUSINESS FUNDING LLC; INSTAFUNDING D/B/A TVT SVPL; INFUSION CAPITAL GROUP, LLC; SKYLINE BUSINESS CAPITAL, LLC; TOP TIER CAPITAL, LLC; PARKSIDE FUNDING GROUP, LLC; and ELITE FUNDING, LLC,** | § | **ADVERSARY NO. 24-3083-MVL** |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

1

|  |  |
|---|---|
| INFUSION CAPITAL GROUP, LLC,<br><br>    **Third-Party Plaintiff,**<br><br>**v.**<br><br>MICHELLE LYNN THRAILKILL<br>AND VICKEY LYNN WIENER,<br><br>    **Third-Party Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court issues the following findings of fact and conclusion of law after the trial that took place on January 28, 2026 (the "**Trial**"), which followed upon that certain summary judgment order dated December 18, 2025, the *Order Granting in part and Denying in part Infusion Capital Group's Motion for Partial Summary Judgment* [ECF No. 193],[1] and two resulting Judgments, the *Summary Judgment as to InstaFunding d/b/a/TVT SPVL*, dated December 19, 2025 [ECF No. 195], and the *Summary Judgment as to Infusion Capital Group, LLC* dated December 22, 2025 [ECF No. 196], the terms of which are incorporated into these Findings of Fact and Conclusions of Law as if set forth at length. The Trial was conducted on the *Second Amended Complaint* (the "**Complaint**") [ECF No. 118], filed by Denali Construction Services, LLC ("**Denali**" or the "**Debtor**" or the "**Plaintiff**") on July 31, 2025, against True Business Funding LLC ("**TBF**") and Infusion Capital Group, LLC ("**Infusion**"), InstaFunding D/B/A TVT SPVL ("**InstaFunding**"), Infusion, Top Tier Capital, LLC, Parkside Funding Group, and Cloudfund, LLC (collectively, the "**Defendants**"), as well as the *First Amended Answer to Plaintiff's Second Amended Complaint, Affirmative Defenses, and Third-Party Complaint* [ECF No. 139], filed by Infusion on August 28,

---

[1] Unless otherwise stated, all ECF No. references are herein made with respect to the docket in Adversary Proceeding No. 24-3083-mvl.

2

2025. The Court notes that all of the Defendants, other than InstaFunding and Infusion, settled with Denali prior to the Trial. The Court conducted a one-day trial. The Court heard the testimony of two witnesses. Neither InstaFunding nor Infusion appeared at the Trial. At the conclusion of the trial, the Court took the matter under advisement and allowed the Plaintiff to submit post-hearing briefing as to attorney's fees. On February 3, 2025, the Plaintiff filed a post-hearing supplemental brief. ECF No. 210.

The following constitutes the Court's findings of fact and conclusion of law as to the Damages Trial.[2]

## **FINDINGS OF FACT**

### A. THE PARTIES

1.    Denali Construction Services, LP was originally formed on December 31, 2012.

2.    Plaintiff Denali is a limited liability company that was converted from Denali Construction Services, LP on January 17, 2023.

3.    Michelle Lynn Thrailkill was formally appointed as Denali's President in 2014 and has managed Denali since that time.

4.    In 2020, Ms. Thrailkill obtained 70% of Denali's equity from Vickey Lynn Weiner.

5.    Ms. Thrailkill and Ms. Wiener are the Third-Party Defendants and guarantors (the "**Third-Party Defendants**" or the "**Guarantors**") in this matter.

6.    Defendant Infusion is a limited liability company that has been organized under the laws of New York, Connecticut and Florida from time to time.

7.    Infusion offers financing to corporate entities.

---

[2] Any findings of fact that constitute conclusions of law shall be deemed such and *vice versa*.

8.   InstaFunding is a limited liability company organized under the laws of Florida and New York, which offers financing to corporate entities.

## B. DENALI'S FINANCIAL DISTRESS

9.   In 2019, Denali discovered that its Chief Financial Officer, Robert Rice, had used his position to embezzle approximately $2 million.

10.   Mr. Rice had embezzled these funds not from Denali's income, but by underfunding Denali's contributions to unions and taxing authorities.

11.   In addition to the $2 million loss Denali suffered from Mr. Rice's theft, Denali had to pay the arrears it owed to unions and taxing authorities.

12.   Mr. Rice's embezzlement caused severe financial distress to Denali.

13.   That financial distress was exacerbated by the onset of the COVID-19 pandemic in the spring of 2020.

14.   In response to Denali's financial distress, from 2019 through 2022, Ms. Thrailkill attempted to find financing for Denali.

15.   Ms. Thrailkill met with numerous banks and financial institutions, but Denali was unable to secure traditional financing.

16.   By late 2022, Denali had reached a crisis point and was unable to continue operating without outside financing due to delayed payment of money owed to it and other business factors associated with the commercial construction business.

17.   Unable to obtain financing from traditional sources, Denali began to obtain merchant cash advances (each an, "**MCA**") starting in October 2022 to assist it with bridging its cashflow needs.

4

18.    Over approximately two years, Denali entered at least 10 separate MCAs with 8 different providers between October 2022 and September 2024.

19.    At the time Denali entered into these agreements, Ms. Thrailkill did not fully understand what an MCA was and thought Denali was obtaining financing that would allow it to continue to operate until cashflow improved.

20.    Ms. Thrailkill believed that all the MCAs Denali entered into were loans and that she could repay them with the money she expected to receive from business operations and an ERC credit that Denali was entitled to receive from the Internal Revenue Service.

21.    The cashflow of the business did not improve, and Denali did not receive the ERC credit from the IRS.

22.    As a result, Denali was forced to obtain additional MCAs to repay the prior MCAs and to pay for business operations because the cashflow to service the debt owed to the MCA lenders was leaving insufficient cash to operate the business.

## C. THE FIRST INFUSION AGREEMENT

23.    On June 11, 2024, Plaintiff entered into a Merchant Agreement with Infusion (the "**First Infusion Agreement**").  A true and correct copy of the First Infusion Agreement was introduced into evidence as Exhibit 13.

24.    In the First Infusion Agreement, Infusion purported to purchase 45% of Denali's future receipts up to $749,500.00 (as defined in the First Infusion Agreement, the "**Purchased Amount**") for $500,000.00 (as defined in the First Infusion Agreement, the "**Purchase Price**").

25.    As part of the First Infusion Agreement transaction, Infusion provided net proceeds to Denali in the amount of $440,000.00.  Specifically, Infusion paid itself $60,000.00 from

the $500,000.00 Purchase Price as origination and underwriting fees for the First Infusion Agreement.

26. Under the First Infusion Agreement, Denali was required to allow Infusion to deduct $12,499.00 per business day by ACH withdrawal from Denali's bank account until the sum of $749,500.00 was paid to Infusion.

27. Infusion withdrew from Denali's bank account, under the terms of the First Infusion Agreement, $299,976.00 between June 12, 2024, and July 12, 2024, at the rate of $12,499.00 per business day.

**D. THE SECOND INFUSION AGREEMENT**

28. On July 12, 2024, approximately one month after the First Infusion Agreement, Plaintiff entered into a second Merchant Agreement (the "**Second Infusion Agreement**") with Infusion. A true and correct copy of the Second Infusion Agreement was introduced into evidence as Exhibit 14.

29. In the Second Infusion Agreement, Infusion purported to purchase 45% of Plaintiff's future receipts up to $1,499,000.00 (as defined in the Second Infusion Agreement, the "**Purchased Amount**") for $1,000,000.00 (as defined in the Second Infusion Agreement, the "**Purchase Price**").

30. From the $1,000,000 Purchase Price proceeds under the Second Infusion Agreement, Infusion paid itself $500,000.00 to fully satisfy the liability that Infusion calculated was owed to it under the First Infusion Agreement as of July 12, 2024.

31. As part of the Second Infusion Agreement transaction, Infusion retained $150,000.00 as an origination and underwriting fees for the Second Infusion Agreement.

32. Infusion deposited $350,000.00 into Plaintiff's bank account under the Second Infusion Agreement, representing the net funding actually provided to Denali.

33. Under the Second Infusion Agreement, Denali was required to allow Infusion to deduct a daily remittance of $18,738.00 per business day by ACH withdrawal from Denali's bank account until the sum of $1,499,000.00 was paid to Infusion.

34. Infusion withdrew $487,188.00 from Denali's bank account, under the terms of the Second Infusion Agreement. The last withdrawal by Infusion under the Second Infusion Agreement occurred on August 21, 2024, as Denali had insufficient funds in the account to pay the required remittance thereafter.

35. Infusion applied a default fee of $206,309.00 to Denali's account balance.

36. The First Infusion Agreement and the Second Infusion Agreement are collectively referred to hereinafter as the "**Infusion Agreements**".

## E. MATERIAL TERMS OF THE INFUSION AGREEMENTS

37. The Infusion Agreements contain materially similar terms.

38. The Infusion Agreements contain language stating that "Merchant[3] hereby sells, assigns and transfers to [Infusion] (making [Infusion] the absolute owner)" a purchased percentage of all future receipts.

39. The Infusion Agreements state: "Merchant is selling a portion of a future revenue stream to [Infusion] at a discount, not borrowing money from [Infusion], therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by [Infusion]."

---

[3] Any capitalized term not defined herein shall adhere to the meaning ascribed to such term in the Infusion Agreements.

40.  The Infusion Agreements provide that the remittance is "a good faith estimate of Purchased Percentage multiplied by revenues of Merchant."

41.  The Infusion Agreements state that "Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement."

42.  The Infusion Agreements acknowledge that "[Infusion] is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and [Infusion] assumes these risks."

43.  The Infusion Agreements state that "Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount."

44.  The Infusion Agreements authorize Defendant "to ACH debit the initial Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday."

45.  The Infusion Agreements provide that "[Infusion] will debit the Remittance each business day from only one depositing bank account . . . until such time as [Infusion] receives payment in full of the Purchased Amount."

46.  The Infusion Agreements state that "Merchant understands that it is responsible for ensuring that the initial Remittance to be debited by [Infusion] remains in the Account and will be held responsible for any fees incurred by [Infusion] resulting from a rejected ACH attempt or an Event of Default."

47.  The Infusion Agreements contain a provision stating: "Notwithstanding anything to the contrary in this Agreement or any other agreement between [Infusion] and Merchant, upon

the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%."

48. The events of default under the Infusion Agreements relate to Denali's "violation of any term or covenant in this Agreement" or Infusion's ability to collect the Infusion Specified Percentage.

49. Upon an event of default under the Infusion Agreements, if Denali attempted to interfere with Infusion's ability to collect the Infusion Specified Percentage, the entire unremitted Purchase Amount would become due, and Infusion could exercise its default remedies against Denali.

50. The Infusion Agreements contained a reconciliation provision that stated, "As long as an Event of Default, or breach of this Agreement, has not occurred, once per calendar month Merchant may request a retroactive reconciliation of the total Remittance Amount."

51. Under the reconciliation provision, if Denali's receipts for a prior month were less than anticipated, Denali could get credited back into its bank account the amount the Infusion Withdrawals exceeded the amount Infusion was entitled to under the Infusion Agreements (i.e., the Infusion Specified Percentage).

52. The Infusion Agreements also contained an "Adjustment to the Remittance" provision allowing Denali, if it experienced a prolonged downturn, to submit its last two weeks of bank account records, and Infusion could adjust the Infusion Withdrawal to an estimate of the Infusion Specified Percentage based on those two weeks instead of Infusion's original underwriting for a period of two weeks.

53. As part of the Infusion Agreements, Denali granted Infusion a security interest in substantially all of its accounts chattel paper, documents, equipment, general intangibles,

9

instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "**UCC**"), all proceeds, as that term is defined in Article 9 of the UCC, funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, present and future Electronic Check Transactions, and any amount which may be due to Infusion under the Agreements, including but not limited to all rights to receive any payments or credits under the Agreements. In addition, under the Infusion Agreements, if at any time there are insufficient funds in its Account to cover a daily remittance, the Infusion Security Agreement automatically expanded to include a security interest in all of Denali's assets of any kind.

54. Infusion advanced funds to Plaintiff with the expectation and contractual right to receive back a specific, predetermined amount that was substantially greater than the amount it advanced.

55. Infusion did not assume genuine risk that the amount it would receive would vary based on Plaintiff's actual business revenues or receivables.

56. The daily ACH debit mechanism provided Infusion with a fixed payment stream from Plaintiff's bank account regardless of whether Plaintiff actually received corresponding customer receipts on any given day.

57. Infusion retained the contractual right to collect the full Purchased Amount from Plaintiff through daily ACH debits.

58. Plaintiff bore the risk of ensuring sufficient funds remained in the Account to satisfy the daily ACH debits, with liability for any rejected ACH attempts or defaults.

59. The provision allowing Infusion to increase the Purchased Percentage to 100% upon an Event of Default operated as an acceleration clause, providing Infusion with immediate rights to all of Plaintiff's receipts upon default.

60. The reconciliation and adjustment provisions in the Infusion Agreements could only be invoked if Denali had not defaulted, were discretionary on Infusion's part, and did not alter the fixed total amount owed.

61. The language in the Infusion Agreements stating that business slowdowns would not constitute a breach is contradicted by the requirement that Denali maintain sufficient funds for daily ACH debits and the liability imposed for rejected ACH attempts.

62. Infusion advanced money to enable Denali to engage in its business venture with the understanding that the advance and an added amount were to be returned to Infusion. That added amount under the Infusion Agreements constituted interest.

63. Denali's repayment obligation was specific and fixed.

64. Denali's repayment obligation was not contingent on the existence or amount of its cashflow.

65. As part of the Infusion Agreements, Ms. Thrailkill and Ms. Wiener guaranteed Denali's obligations under the Infusion Agreements.

66. The Infusion Agreements provide that Connecticut law shall govern.

67. On December 19, 2025, this Court entered an Order finding that Texas law governs the Infusion Agreements. ECF No. 195.

68. The Infusion Agreements contain merger clauses providing: "This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant

11

and [Infusion] and supersede all prior agreements and understandings relating to the subject matter hereof."

69.    The Plaintiff transferred an interest in property of the Plaintiff to Infusion by granting a security interest to Infusion pursuant to the Infusion Agreements.  Infusion filed a UCC-1 financing statement on or about July 18, 2024.

70.    Pursuant to the First Infusion Agreement, Infusion purportedly purchased $749,500.00 of Plaintiff's accounts receivable in exchange for $500,000.00.  However, Infusion provided net funding of only $440,000.00 to the Plaintiff.  In return, the Plaintiff incurred the obligation to repay Infusion $749,500.00.  Thus, pursuant to the First Infusion Agreement, Infusion charged Denali interest of $309,500.00.  Upon entry into the First Infusion Agreement, Infusion automatically deducted by ACH withdrawal the sum of $12,499.00 per business day.  Denali repaid Infusion $799,976.00 over 33 days.  Accordingly, the effective interest rate for the First Infusion Agreement was 427.9%, and Infusion received $359,976.00 more than the value it provided to the Plaintiff.

71.    Plaintiff did not receive reasonably equivalent value for the obligations incurred to Infusion pursuant to the First Infusion Agreement.

72.    Denali was insolvent on June 11, 2024.

73.    Pursuant to the Second Infusion Agreement, Infusion purportedly purchased $1,499,000.00 of Plaintiff's accounts receivable in exchange for $1,000,000.00. However, Infusion provided net funding of only $850,000.00 to the Plaintiff, and Infusion used $500,000.00 of such net funding to retire the balance of the First Infusion Agreement as well as pay itself $50,476.00 more than it was entitled to under the terms of the First Infusion Agreement. Upon entry into the Second Infusion Agreement, Infusion automatically

12

deducted by ACH withdrawal the sum of $18,738.00 per business day.  In return, Plaintiff incurred the obligation to repay Infusion $1,499,000.00 over 80 days. Accordingly, the effective interest rate for the Second Infusion Agreement was 348.3%, and Plaintiff incurred the obligation to pay $649,000.00 more than the value Infusion provided to Plaintiff.

74.    Plaintiff did not receive reasonably equivalent value for the obligations incurred to Infusion pursuant to the Second Infusion Agreement.

75.    Denali was insolvent on July 12, 2024.

76.    The obligations incurred and transfers made to Infusion occurred at a time when the Plaintiff was insolvent. Preceding the Plaintiff's entry into the Infusion Agreements, the Plaintiff suffered losses from internal embezzlement coupled with the COVID-19 pandemic and associated government lockdowns which rendered the Plaintiff generally unable to pay its debts as they came due. At that time, and all the way through the October 4, 2024 (the "**Petition Date**"), the sum of the Plaintiff's debts was greater than all of Plaintiff's property at a fair valuation. Plaintiff's schedules filed in the Bankruptcy Case indicate total assets of $6,032,087.35 and total liabilities of $7,033,354.48 as of the Petition Date. 11 U.S.C. § 101(32)(A); *Summary of Assets and Liabilities for Non-Individuals* [Main Bankruptcy Case, ECF No. 142].  Moreover, as a result of the Infusion Agreements, Infusion automatically deducted from Plaintiff's bank account sums ranging from $12,499.00 to $18,738.00 *per day* until the Plaintiff was utterly depleted of all capital. These deductions left Denali unable to pay its debts when they came due. Likewise, entry into the Infusion Agreements left the Plaintiff with an unreasonably small capital.

13

77. Plaintiff did not receive reasonably equivalent value for the obligations incurred and transfers made pursuant to the Infusion Agreements, which Plaintiff entered into while insolvent or which rendered Plaintiff insolvent as a result of the Infusion Agreements.

## F. THE INSTAFUNDING AGREEMENT

78. On December 19, 2025, this Court entered that certain *Summary Judgment as to Instafunding d/b/a/TVT SPVL* (the "**InstaFunding Judgment**") [ECF No. 195]. Plaintiff was awarded judgment against InstaFunding as to Counts I and II. Counts III and IV were dismissed. The terms of the InstaFunding Judgment and the bench ruling supporting same are adopted in their entirety.

79. At the Trial, the Plaintiff determined to forgo proceeding on Counts VI, VII, VIII and IX against InstaFunding. All other Counts against InstaFunding have been dismissed.

## H. ECONOMIC SUBSTANCE OF THE INFUSION AGREEMENTS

80. Under the First Infusion Agreement, Plaintiff received net funding of $440,000.00

81. The term of the payments for the First Infusion Agreement is 60 days ($749,500.00 Purchase Price divided by the $12,499.00 Daily Remittance), which is also .1644 of a year (60/365).

82. The interest charged under the First Infusion Agreement is $309,500.00 ($749,500.00 Purchase Price less $440,000 net funding amount).

83. The APR for the First Infusion Agreement was 427.9% ($309,500/($440,000.00 * .1644)).

84. Under the Second Infusion Agreement, Plaintiff received net funding of $850,000.00 ($350,000 disbursed to Plaintiff and $500,000 to pay off the First Infusion Agreement).

14

85.     The term of the payments for the Second Infusion Agreement is 80 days ($1,499,000.00 Purchase Price divided by the $18,738.00 Daily Remittance), which is also .2192 of a year (80/365).

86.     The interest charged under the Second Infusion Agreement is $649,00.00 ($1,499,000.00 Purchase Price less $850,000 net funding amount).

87.     The APR for the Second Infusion Agreement was 348.3% ($649,000.00/($850,000.00 * .2192)).

## I. BANKRUPTCY FILING AND ADVERSARY PROCEEDING

88.     On the Petition Date, Denali filed a voluntary Chapter 11 petition in this Court.

89.     Shortly after commencing its bankruptcy case, on October 7, 2024, Denali commenced the above-captioned adversary proceeding against the Defendants.

90.     On July 31, 2025, Denali filed its Second Amended Complaint.

91.     On August 28, 2025, Infusion filed an answer to the Second Amended Complaint and brought third-party claims for breach of guaranty against the Guarantors, Ms. Thrailkill and Ms. Wiener.

92.     InstaFunding filed an answer to Plaintiff's Original Petition on December 16, 2024.

93.     Despite proper notice, InstaFunding did not file an Answer to Plaintiff's Second Amended Petition.

94.     Despite proper notice, InstaFunding did not respond to the Requests for Admission or Interrogatories served on InstaFunding on July 25, 2025.

95.     Despite proper notice, InstaFunding failed to attend the duly noticed FRCP 30(b)(6) deposition of its corporate representative scheduled for September 18, 2025.

96.     Despite proper notice, InstaFunding failed to attend the duly noticed hearing on Plaintiff's Motion for Summary Judgment scheduled for October 23, 2025 or the Trial.  Despite proper notice, Infusion failed to attend the Trial.

## CONCLUSIONS OF LAW

### A. APPLICABLE LEGAL STANDARD

97.     Under Texas law, a "loan" is defined as "an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to pay the creditor." Tex. Fin. Code § 301.002(a)(10).

98.     An "account purchase transaction" is "an agreement under which a person engaged in a commercial enterprise sells accounts, instruments, documents, or chattel paper . . . at a discount." Tex. Fin. Code § 306.001(1).

99.     The distinction between purchase and lending transactions can be "blurred". *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 416 (5th Cir. 2003); Tex. Bus. & Comm. Code § 9.109 cmt. 4.

100.    To determine whether a transaction is a loan or a sale, courts ascertain the "intention of the parties as disclosed by the contract, attending circumstances, or both." *Korrody v. Miller*, 126 S.W.3d 224, 226 (Tex. App.—San Antonio 2003, no pet.); *Express Working Capital, LLC v. Starving Students, Inc.*, 28 F. Supp. 3d 660, 666-67 (N.D. Tex. 2014).

101.    "Whether an amount of money constitutes interest depends not on what the parties call it but on the substance of the transaction." *First USA Mgmt., Inc. v. Esmond*, 960 S.W.2d 625, 627 (Tex. 1997).

16

102.    When there are no disputed facts, courts may determine as a matter of law whether a charge is "additional interest" for the lending of money. *Swank v. Sverdlin*, 121 S.W.3d 785, 791-92 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

103.    In a contract to loan money, the material terms generally include the amount to be loaned, the maturity date of the loan, the interest rate, and the repayment terms. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

104.    "When money is advanced to enable one to engage in a business venture with the understanding that the advance and an added amount are to be returned, there is a loan, and the added amount is interest, which may not exceed the statutory maximum, regardless of the form of transaction." *Koch v. Boxicon, LLC*, No. 05-14-01424, 2016 WL 1254048, * 6 (Tex. App.—Dallas Mar. 30, 2016, no pet.) (quoting *Johns v. Jaeb*, 518 S.W.2d 857, 859 (Tex. App.—Dallas 1974, no writ)) (cleaned up).

105.    The subjective intent of the parties is presumed to be reflected in the documents which they signed. *Johns v. Jaeb*, 518 S.W.2d at 860.

106.    The subjective intent of the lender is irrelevant if, in fact, the lender has contracted for, charged or received interest on a loan in excess of the maximum permitted by law. *Cochran v. American Sav. and Loan Ass'n of Houston*, 586 S.W.2d 849 (Tex. 1979).

**B. CHARACTERIZATION OF THE INFUSION AGREEMENTS AS LOANS**

107.    Despite being labeled "Purchase and Sale of Future Receivables" and containing language characterizing the transactions as purchases of future receivables, the Infusion Agreements constitute loans under Texas law based on their economic substance and the true intention of the parties as disclosed by the contracts and attending circumstances.

108.    Under the First Infusion Agreement, Infusion advanced $440,000 in net proceeds to Plaintiff with an absolute obligation that Plaintiff repay $749,500—a predetermined, fixed amount that did not vary based on Plaintiff's actual business receipts or receivables.

109.    Under the Second Infusion Agreement, Infusion advanced $350,000 in net proceeds to Plaintiff with an absolute obligation that Plaintiff repay $1,499,000—a predetermined, fixed amount that did not vary based on Plaintiff's actual business receipts or receivables.

110.    The daily ACH debit mechanism of the Infusion Agreements constitutes a payment schedule requiring Plaintiff to ensure sufficient funds remained in the designated account, effectively creating fixed payment obligations regardless of actual customer receipts.

111.    Plaintiff bore the full risk of repayment, being held responsible for rejected ACH attempts and any fees resulting from insufficient funds, demonstrating that the First Infusion Agreement did not involve a true purchase where Infusion assumed the risk of Plaintiff's business performance.

112.    The provision increasing the Purchased Percentage to 100% upon an Event of Default operates as an acceleration clause typical of loan agreements.

113.    The Infusion Agreements collectively lack the characteristics of a true account purchase transaction because Infusion did not assume any meaningful risk that the amount received would be less than the Purchased Amount based on Plaintiff's actual business receipts.

114.    The requirements that Plaintiff maintain sufficient funds for daily ACH debits, notify Infusion if funds would not be in the account, coupled with its liability for rejected ACH attempts contradict the provisions of the Infusion Agreements that Plaintiff's bankruptcy, business closure, or slowdown would not constitute a breach.

115. The statement that "Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount" is belied by the contractual mechanisms that effectively guarantee payment of the full Purchased Amount through daily ACH debits and default provisions.

116. The economic reality of the Infusion Agreements is that Infusion advanced money to Plaintiff with the expectation and contractual right to receive back a predetermined amount significantly exceeding the advance, satisfying the definition of a loan under Section 301.002(a)(10) of the Texas Finance Code.

117. The Infusion Agreements contained data that allows the Court to calculate the traditional loan terms of an interest rate and specific maturity date.

118. There was an exchange where money was advanced with an obligation to repay a fixed, predetermined amount plus additional compensation.

119. The form of the transaction—*i.e*, calling it a purchase rather than a loan—does not control where the substance demonstrates a lending transaction. *First USA Mgmt.*, 960 S.W.2d at 627.

120. The reconciliation and adjustment provisions in the Infusion Agreements do not transform the transactions into true purchases because: (a) they were discretionary; (b) they were only available if Denali had not defaulted; and (c) they did not alter the fixed total amount owed.

121. Based on the contractual terms and attending circumstances, the Court concludes that the Infusion Agreements constitute loans of money under Texas law.

## C. USURY VIOLATION—INFUSION AGREEMENTS

122. Under Texas law, a transaction is considered "usurious" if: (1) it is a loan of money; (2) there is an absolute obligation to repay the principal; and (3) if there is exaction of a greater

compensation than allowed by law for the use of the money by the borrower. *See First Bank v. Tony's Tortilla Factory*, 877 S.W.2d 285, 287 (Tex. 1994).

123.    The Infusion Agreements constitute money loans for the reasons set forth above.

124.    Plaintiff had an absolute obligation to repay the principal amount advanced, as evidenced by the daily ACH debit requirement, the liability for rejected ACH attempts, and the acceleration provisions upon default.

125.    For commercial loans under Texas law, a creditor may contract for and receive interest that does not exceed 28 percent per year. Tex. Fin. Code §§ 303.009(c), 306.002(a).

126.    The difference between the amount Plaintiff received ($350,000) and the amount Plaintiff was obligated to repay ($1,499,000), or $1,149,000, represents the interest charged on the loan.

127.    The $1,149,000 difference between the net proceeds and the Purchased Amount under the Second Infusion Agreement represents compensation for the use of money, which constitutes interest under Texas law regardless of how the parties labeled it. *First USA Mgmt*, 960 S.W.2d at 627.

128.    Given that Infusion did not use a third-party originator and the origination appeared perfunctory at best, the $150,000 origination fee under the Second Infusion Agreement, representing 15% of the stated Purchase Price or over 42% of the net proceeds actually advanced to Plaintiff, likewise constitutes interest. *Swank*, 121 S.W.3d at 791-92.

129.    Even accounting for various calculation methodologies and timeframes, the interest rate charged under the Infusion Agreements manifestly and substantially exceeds the 28% maximum annual rate permitted for commercial loans under Texas Finance Code § 303.009(c).

130.    Where the contract on its face reserves more than legal interest, the usurious intent is apparent, and no room exists for a contrary presumption. *Maxwell v. Estate of Bankston*, 433

20

S.W.2d 229, 233 (Tex. App.—Texarkana 1968, no writ). Even if a contrary presumption were to exist, Infusion failed to defend the allegations at Trial.

131. Infusion contracted for and charged interest vastly in excess of the maximum permitted by Texas law in connection with a commercial transaction.

132. The Infusion Agreements violate Texas usury laws and are contrary to public policy. Tex. Fin. Code § 302.001(b).

133. Any provision of the Infusion Agreements violative of Texas usury law is void under Texas law and of no effect.

**D. INAPPLICABILITY OF DEFENSES**

134. The Infusion Agreements do not qualify as "account purchase transactions" under Texas Finance Code § 306.001(1) because they are loans, not true purchases of accounts or receivables.

135. The charging of usurious interest was not an accidental or bona fide error under Texas Finance Code § 305.101 where the contracts on their face charged interest vastly exceeding legal limits.

136. The correction provisions of Section 305.103 of the Texas Finance Code do not apply where, as here, the lender has not taken steps to correct the usurious charge prior to litigation.

137. Defendant cannot avoid liability for usury by labeling the transactions as purchases of future receivables where the economic substance is that of a loan.

**E. DAMAGES AND REMEDIES**

138. All contracts for usurious interest are contrary to public policy and subject to the appropriate penalty prescribed by Chapter 305 of the Texas Finance Code. Tex. Fin. Code § 302.001(b).

21

139.    A creditor who contracts for interest that is greater than the amount authorized by the Texas Finance Code in connection with a commercial transaction is liable to the obligor for an amount equal to three times the amount computed by subtracting the amount of interest allowed by law from the total amount of interest contracted for, charged, or received. Tex. Fin. Code § 305.001(a-1).

140.    Plaintiff is entitled to statutory damages under Texas Finance Code § 305.001(a-1) based on the usurious interest contracted for in the Infusion Agreements.

141.    The Court awards Plaintiff treble damages calculated as three times the difference between the interest actually contracted for and the maximum legal interest that could have been charged at 28% per annum.

142.    Under the First Infusion Agreement, Infusion contracted for $309,500.00 in interest. Under Texas law, Infusion was only allowed 28% annual interest, given the 60 day life of the loan and the amount disbursed to the Debtor, $440,000.00, which equates to lawful interest totaling $20,254.08. After subtracting the amount allowed by law, $20,254.08, from the contracted amount of $309,500.00, $289,245.92 constitutes excess usurious interest. Under Section 305.001(a-1) of the Texas Finance Code, treble damages equal $867,737.76 with respect to the First Infusion Agreement.

143.    Under the Second Infusion Agreement, Infusion contracted for $649,000.00 in interest. Under Texas law, Infusion was only allowed 28% annual interest, given the 80-day life of the loan and the amount disbursed to the Debtor, $850,000.00, which equates to lawful interest totaling $52,169.60. After subtracting the amount allowed by law, $52,169.60, from the contracted amount of $649,000.00, $596,830.40 constitutes excess usurious interest. Under

Section 305.001(a-1) of the Texas Finance Code, treble damages equal $1,790,491.20 with respect to the Second Infusion Agreement.

144.    The total amount of damages owed by Infusion to Denali with respect to the violative portions of the Infusion Agreements relative to usurious interest is $2,658,228.96.

145.    Plaintiff is entitled to declaratory relief concluding that the Infusion Agreements constitute usurious loans under Texas law.

146.    Under Texas law, "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 484 (Tex. 2019) (citation omitted) (internal quotations omitted).

147.    Under the lodestar analysis adopted by the Supreme Court of Texas, the first step in the analysis in calculating an attorney's fee award is "determining the reasonable hours worked multiplied by a reasonable hourly rate." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 354 (Tex. 2020) (quoting *Rohrmoos*, 578 S.W.3d at 498).

148.    The burden is on the claimant to show that the requested fees are reasonable. *Id.* To satisfy the burden, the claimant's evidence should include, at a minimum, evidence of: "(1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.*

149.    In *Rohrmoos*, the Texas Supreme Court noted what bankruptcy courts typically refer to as the *Johnson* factors to determine reasonableness:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions;
> (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of other employment by the attorney due to acceptance of the case;
> (5) the customary fee;
> (6) whether the fee is fixed or contingent;

23

(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10)      the "undesirability" of the case;
(11)      the nature and length of the professional relationship with the client; and
(12)      awards in similar cases.

*Rohrmoos*, 578 S.W.3d at 490–91 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

150.    There was no substantive challenge to the reasonableness of Plaintiff's counsel's fees and expenses.

151.    The fees and expenses billed by counsel to Denali, the Nelson Law Group [ECF Nos. 208-34–35 and ECF No. 210], were below market and constituted reasonable fees and expenses. The fees and expenses were reasonable in the amount of time required to perform the services, and the hourly rate for each person performing such services. The attorneys at Nelson Law Group are skilled, reputable attorneys, respected in their field.

152.    Plaintiff is entitled to reasonable and necessary attorney's fees and costs as provided by law. Tex. Fin. Code § 305.005.

153.    The Plaintiff requested $65,777.28 in attorney's fees related to the Adversary Proceeding relative specifically as to Infusion. ECF No. 210. The Plaintiff requested $43,888.13 in attorney's fees related to the Adversary Proceeding relative specifically as to InstaFunding. *Id.* The total attorney's fees for the Adversary Proceeding owed by Denali totaled $464,010.50. *Id.* There was no evidence from which the Court could assess any additional fees relative to fees attributable to all Defendants.

154.    Plaintiff is entitled to reasonable and necessary attorney's fees and costs against InstaFunding in the amount of $43,888.13.

24

155. Plaintiff is entitled to reasonable and necessary attorney's fees and costs against Infusion in the amount of $65,777.28.

## F. THIRD-PARTY DEFENDANTS

156. The Third-Party Defendants, Ms. Thrailkill and Ms. Wiener, served as guarantors under the Infusion Agreements.

157. Because the underlying Infusion Agreements are usurious, all interest and fees charged in connection with same are void under Texas law.

158. The Infusion Agreements expressly state that "Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount."

159. Even if the guaranties were enforceable, the Third-Party Defendants did not guarantee payment of the Purchased Amount but only Denali's performance of the agreement terms.

160. The Guarantors have no further liability to repay any debts under the Infusion Agreements or the related guaranties.

161. Infusion failed to appear at Trial and prosecute its Third-Party Complaint. The Court awards judgment in favor of Ms. Thrailkill and Ms. Wiener on all Counts asserted therein.

## G. CONSTRUCTIVELY FRAUDULENT TRANSFER

162. The Infusion Agreements constitute obligations incurred by the Plaintiff on June 11, 2024, and July 12, 2024—each within two years before the Petition Date. The lien granted by Plaintiff to Infusion pursuant to the Infusion Agreements constitutes a transfer of an interest of the Plaintiff in property.  11 U.S.C. § 101(54). Infusion filed a UCC-1 financing statement on or about July 18, 2024, constituting a "transfer" as of that date.  11 U.S.C. § 548(d)(1).

25

163. To establish a *prima facie* case for avoiding a transfer as constructively fraudulent, the plaintiff must demonstrate that the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation." *In re Hannover Corp.*, 310 F.3d 796 (5th Cir. 2002) (quoting 11 U.S.C. § 548(a)(1)(B)(i)).

164. Reasonably equivalent value is not defined in the Bankruptcy Code. In the Fifth Circuit, to satisfy this element, the debtor must have "received value that is substantially comparable to the worth of the transferred property." *Stanley v. U.S. Bank Nat'l Ass'n. (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (quoting *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 548 (1994)) (internal quotations omitted).

165. Reasonably equivalent value is measured from the standpoint of creditors and the proper focus is on the net effect of the transfers on the debtor's estate, and the funds available to unsecured creditors. *Id.* (citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)) (internal citation omitted) (internal quotations omitted).

166. Plaintiff did not receive reasonably equivalent value for the obligations incurred and transfers made to Infusion pursuant to the Infusion Agreements.

167. Pursuant to the First Infusion Agreement, Infusion received $359,976.00 *more* than the value it provided to the Plaintiff.

168. Pursuant to the Second Infusion Agreement, Infusion received $649,000.00 *more* than the value it provided to Plaintiff.

169. In total, Infusion received $1,008,976.00 *more* than the value it provided to Plaintiff.

170. At the time of the obligations incurred and transfers made to Infusion, the sum of the Plaintiff's liabilities was greater than all of Plaintiff's assets at a fair valuation; Plaintiff's engagement in the transactions underlying the Infusion Agreements left the Plaintiff with

26

unreasonably small capital; or the Plaintiff was insolvent or became insolvent as a result of the transfers made and obligations incurred in connection with the Infusion Agreements.

171. Therefore, (i) the Infusion Agreements are hereby avoided pursuant to 11 U.S.C. § 548(a)(1)(B) as constructively fraudulent obligations; and (ii) any lien granted by Plaintiff to Infusion is hereby avoided pursuant to 11 U.S.C. § 548(a)(1)(B) as a constructively fraudulent transfer.

Counsel for Plaintiff is directed to upload a form of Judgment consistent with these Findings of Fact and Conclusions of Law.

### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ###